FILED
IN OPEN COURT
OCT -8 2009
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | NO. 1:08CR101 |
| | ) | |
| MOHAMMAD ALAZZAM, | ) | Judge James C. Cacheris |
| | ) | |
| Defendant. | ) | |

## STATEMENT OF FACTS

Were this case to go to trial, the United States would prove by admissible evidence and beyond a reasonable doubt the following:

1. From in or about March 2007, and continuing thereafter until on or about February 15, 2008, in the Eastern District of Virginia and elsewhere, the defendant and others including, but not limited to, FARES ABULABAN, MUNEER MAJALI, WADDAH MUBAIDIN, AMJAD ALOKUSH, IYAD ABDULLAH, MOHAMED EL-BECHIR, DANNY COOPER, a.k.a. Indio, JOSEPH DEW, a.k.a. Skoot, DANIEL PAGE, and CHRISTOPHER LOCKLEAR unlawfully, intentionally, and knowingly conspired to possess with intent to distribute two controlled substances, to wit: 1) five (5) kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance; and 2) 1015 tablets (305.7 grams) of a mixture and substance containing a detectable amount of Ecstasy (3,4-methylenedioxy amphetamine/MDA), a Schedule I controlled substance in violation of Title 21, United States Code, Sections 841 (a)(1) and 846.

NORTH CAROLINA TRANSACTION (Cocaine)

2. On May 14, 2007, at approximately 7:50 p.m., the defendant met with a cooperating individual ("CI") outside of 7418 Vernon Square Drive, Alexandria, Virginia, the residence of WADDAH MUBAIDIN ("MUBAIDIN"). After a short drive to an isolated parking lot, the defendant informed the CI that the defendant had a person, known as "Indio" (later identified as DANNY COOPER ("COOPER")), in North Carolina who was interested in buying ten (10) kilograms or more of cocaine from the CI's "friend." The "friend", unbeknownst to the defendant, was an ICE undercover agent ("UC") posing as a high level Columbian cocaine source and money launderer. While at that location, the defendant called COOPER to tell him that he would have an opportunity to meet with the CI and his "friend," the UC. During the conversation, the defendant asked COOPER how much cocaine COOPER wanted to buy for the initial purchase. COOPER said he wanted to buy thirty (30) kilograms of cocaine. The defendant told COOPER that the UC would charge COOPER $14,000 per kilogram. At that point, the defendant handed the telephone to the CI. The CI and COOPER made arrangements to meet the following Friday in Virginia to negotiate the deal with his "friend," the UC.

3. On May 21, 2007, at the residence of MUBAIDIN, in Alexandria, Virginia, the defendant, MUBAIDIN, and MUNEER MAJALI ("MAJALI") met with the CI. During the meeting there was a discussion about the upcoming sale of kilogram amounts of cocaine to COOPER and the sale of 2000 tablets of Ecstasy (MDA) to the UC. At the time, MUBAIDIN stated that he wanted to be paid for the use of his apartment as a meeting place if the deal went through with COOPER. After the meeting, the defendant told MUBAIDIN that he would pay MUBAIDIN $1,000. MUBAIDIN indicated he was agreeable to the payment.

4. On May 22, 2007, at the Malibu Grill, 5715 Columbia Pike, Falls Church, Virginia, COOPER, his associate, JOSEPH DEW, a.k.a. Skoot ("DEW"), and the defendant met with the UC and another undercover agent. During the meeting, COOPER and DEW told the undercover agents that they were in the market to purchase a large quantity of cocaine and that they, and their friends, were capable of distributing hundreds of kilograms of cocaine each month. COOPER, DEW, and the defendant agreed to a purchase of 150 kilograms at approximately $8-10,000 per kilogram. After COOPER and DEW left the meeting, the defendant told the agents that he had been doing business with both COOPER and DEW for several years and that they were good customers.

5. On May 30, 2007, at Pistone's Italian Inn, 6320 Arlington Boulevard, Seven Corners, Virginia, the defendant and AMJAD ALOKUSH ("ALOKUSH") met with the undercover agents and discussed the details of the proposed 150 kilogram sale to COOPER and DEW. During this meeting, the defendant introduced ALOKUSH as his "business partner," stating "we do everything together." The defendant stated again that he had done business with COOPER and DEW for several years and never had any problems.

6. On June 14, 2007, at the Extra Virgin Restaurant, 4053 Campbell Avenue, Arlington, Virginia, COOPER, DEW, and the defendant again met with undercover agents and the CI. COOPER and DEW, told the agents that COOPER and his associates has secured $1,200,000 for the initial down payment for the 150 kilograms of cocaine. COOPER asked the agents if a "flash" of $600,000 would be sufficient to get the order initiated in Colombia (South America). They agreed that the "flash" would take place in Lumberton, North Carolina, but the initial delivery of the cocaine would have to be in Richmond or Norfolk, Virginia. COOPER and DEW

told the agents that they would be able to sell between 250 and 300 kilograms of cocaine each month.

7. On June 22, 2007, after an unsuccessful attempt to show the UC $600,000 in North Carolina, COOPER told the UC that he had $300,000 of his own money that could be "flashed" for a smaller order.

8. On or about July 16, 2007, the defendant and the CI drove to Rowland, North Carolina and met with COOPER and DEW. At that time, COOPER and DEW showed the defendant $85,000, which COOPER and DEW wanted to be used to purchase 25 kilograms of cocaine.

9. On July 24, 2007, at the Extra Virgin Italian Restaurant in Arlington, Virginia, the defendant met with the CI and undercover agents to discuss the logistics of supplying COOPER and DEW with one hundred (100) kilograms of cocaine. Later that evening, the defendant, MAJALI, MUBAIDIN, and the CI drove to Lumberton, North Carolina to meet with COOPER to further discuss the 100 kilogram deal.

SOUTH CAROLINA TRANSACTION (Cocaine)

10. On September, 19, 2007, the defendant and the CI drove from Northern Virginia to a location on Route 1 in North Carolina where they met COOPER and DEW. The defendant and the CI followed COOPER and DEW to McColl, South Carolina, to the auto repair shop owned by DANIEL PAGE. The purpose of the trip was to verify that DANIEL PAGE ("PAGE") and CHRISTOPHER LOCKLEAR ("LOCKLEAR") had sufficient cash available to purchase kilogram amounts of cocaine. While at the auto repair shop, PAGE instructed LOCKLEAR to retrieve cash from a hidden location to show to the defendant, COOPER and the CI (DEW was not present at the time). LOCKLEAR did as instructed. About five minutes later, LOCKLEAR produced approximately $75,000 in cash (according to PAGE), which LOCKLEAR and PAGE

showed to the defendant, COOPER, and the CI as proof that LOCKLEAR and PAGE were prepared to make a multiple kilogram purchase of cocaine.

11. On September 20, 2007, at the Sahara Cafe in Morgantown, West Virginia, the defendant met with the UC. During the meeting, the defendant told the UC that PAGE had $110,000 to use as a down payment for the purchase of cocaine. The UC told the defendant that he would charge PAGE between $16,000 and $17,000 for each kilogram of cocaine. The defendant and the UC agreed to meet with PAGE on September 28, 2007 in Richmond, Virginia.

12. On September 24, 2007, at La Madeline Restaurant in Reston, Virginia, the defendant confirmed with the UC that PAGE wanted to meet with the UC on September 28, 2007. The defendant told the UC that PAGE had the cash available to use as a down payment for the cocaine.

13. On September 28, 2007, at the Hill City Chop House, in Glen Allen, Virginia, LOCKLEAR, PAGE, and the defendant, met with UC agents to discuss the purchase of cocaine. During the meeting, PAGE and LOCKLEAR told the undercover agents that they wanted to buy twenty (20) kilograms of cocaine. PAGE and LOCKLEAR agreed to pay as much as $17,000 per kilogram of cocaine, for a total of $340,000 for twenty (20) kilograms. The UC agents told PAGE and LOCKLEAR that they would have to make a down payment of at least 30% to 50%. PAGE and LOCKLEAR agreed to do so. As a sign of good faith, PAGE and LOCKLEAR took the defendant and the UC agents to PAGE and LOCKLEAR's vehicle to show them their money. While at the vehicle, LOCKLEAR reached into the toolbox of PAGE's 2001 Chevrolet 3500 pick-up truck, took hold of a grocery bag containing a large amount of cash, and handed it to PAGE. PAGE told the defendant and the UC agents that the bag contained $110,000, because

that was the amount he was instructed to bring. PAGE and LOCKLEAR offered the money to the UC agents, who refused to take it at that time.

## NEW YORK CITY TRANSACTION (Ecstasy)

14. In March 2007, FARES ABULABAN introduced the CI to the defendant and WADDAH MUBAIDIN.

15. On March 28, 2007, after ABULABAN instructed the CI to tell the UC that ABULABAN had a significant source of supply (the defendant) for large quantities of Ecstasy, a telephone call took place between ABULABAN and the UC. During that call, ABULABAN told the UC that ABULABAN could get the Ecstasy ("medication") and was going to New York City to discuss the acquisition with an "associate" (the defendant). The UC told ABULABAN the UC needed a large quantity, to which ABULABAN stated that would not be a problem.

16. On April 1, 2007, at 7418 Vernon Square Drive, Apt. 301, Alexandria, Virginia, the residence of MUBAIDIN, the defendant, ABULABAN, and MUBAIDIN met with the CI to discuss the sale of approximately 2,500 tablets of Ecstasy to the UC for $10 per tablet.

17. On May 12, 2007, at 12 Winnebago Road, Apt. 12, Yonkers, New York, the CI met with the defendant to further negotiate the price for the Ecstasy. They agreed that the per tablet charge would be $10, $8 would be paid to the defendant's source, and $2 would be split between the defendant and the CI.

18. On May 14, 2007, the defendant met with the CI and told the CI that the Ecstasy had arrived from Canada and would be available to sell to the UC the following week.

19. On May 21, 2007, at the apartment of MUBAIDIN in Alexandria, Virginia, a meeting was conducted between the defendant, MUBAIDIN, MAJALI, and the CI. After that

meeting, the defendant told the CI that the 2,000 tablet sale would be made on two separate occasions of 1,000 tablets each, and gave the CI a one tablet sample.

20. On May 30, 2007, at Pistone's Italian Inn, 6320 Arlington Boulevard, Seven Corners, Virginia, the defendant introduced AMJAD ALOKUSH ("ALOHUSH") to the UC as the defendant's "business partner." At that time, both the defendant and ALOKUSH discussed the pending Ecstasy transaction. They told the UC that their supplier for Ecstasy had just returned from Canada and insisted that the first transaction be for only 1,000 tablets at $10 per tablet. They informed the UC that the purchase had to take place in New York City in a parking lot. The defendant and ALOKUSH stated that they were not sure if this specific supplier would be able to deliver on a consistent basis, but they had another supplier who could.

21. On June 12, 2007, at a Dunkin Donuts in Yonkers, New York, the defendant met with the UC. The defendant told the UC that on the COOPER cocaine transaction, COOPER had $1,200,000 ready to pay on the 150 kilogram deal and that the defendant would be in the Washington, D.C. area within the next two days (see, paragraph 6 above). The defendant, then made a telephone call and informed the UC that "Eddie" would be arriving shortly with the 1,000 tablets of Ecstasy. Approximately 15 minutes later, IYAD ABDULLAH ("ABDULLAH") arrived and gave the UC a "Nature Valley Granola Bar" box that contained approximately 1,015 tablets of Ecstasy. Shortly thereafter, the UC gave the defendant $10,000 in a white envelope, which the UC slid across the table to the defendant while they were in the Dunkin Donuts in Yonkers.

22. The acts taken by the defendant, MOHAMMAD ALAZZAM, in furtherance of the offenses charged in this case, including the acts described above, were done willfully and knowingly with the specific intent to violate the law. The defendant acknowledges that the

foregoing statement of facts does not describe all of the defendant's conduct relating to the offenses charged in this case, nor does it identify all of the persons with whom the defendant may have engaged in illegal activities. The defendant further acknowledges that he is obligated under his plea agreement to provide additional information about this case beyond that which is described in this statement of facts.

Respectfully submitted,

Neil H. MacBride
United States Attorney

By: _____
Gordon D. Kromberg
Assistant United States Attorney

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, MOHAMMAD ALAZZAM, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
MOHAMMAD ALAZZAM
Defendant

I am MOHAMMAD ALAZZAM's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts and conditions is an informed and voluntary one.

_____
Gregory E. Stambaugh
Attorney for MOHAMMAD ALAZZAM